UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DONALD GARROW, | } |
| Plaintiff, | } |
| v. | } CASE NO. CV 01-JEO-3025-S |
| THOMPSON TRACTOR COMPANY, INC., | } |
| Defendant. | } |

**ENTERED**
JUL 25 2003

## MEMORANDUM OPINION

Before the court is the defendant's Motion for Summary Judgment. (Doc. 11).[1] For the reasons set forth below, the court finds that the Motion for Summary Judgment is due to be granted.

## FACTUAL BACKGROUND

Plaintiff Donald Garrow (the "plaintiff" or "Garrow") worked for defendant Thompson Tractor Company, Inc. (the "defendant" or "Thompson"), at its facilities in Panama City, Florida, and Montgomery, Alabama, from June 1998 to April 2001. (Complaint at ¶ 9; Pl. Depo. at Ex. 4).[2] The defendant is an Alabama corporation whose business includes the repair and servicing of Caterpillar-brand heavy machinery. (Wright Depo. at 8-9, 18).[3] The plaintiff is

---

[1] References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.

[2] The plaintiff's deposition is located in the record at doc. 13, among the evidentiary materials submitted by the defendant. Exhibits to the deposition are as numbered in that document by the defendant, unless otherwise noted.

[3] Wright's deposition is located in the record at doc. 13, among the evidentiary materials submitted by the defendant. Exhibits to the deposition are as numbered in that document by the

a white male born in 1971 in Albany, New York, who moved to Alabama in 1996, accompanied by his wife, who is also a native of New York. (Pl. Depo. at 7-8, 10-11).

The plaintiff worked as a heavy equipment mechanic in the defendant's service department in its Montgomery facility from June 1998 until the summer of 2000. (Complaint at ¶ 9; Pl. Depo. at 29, Ex. 4; Bacon Declaration at ¶ 3[4]). The plaintiff's immediate supervisor was Wesley Till ("Till"), Service Supervisor of the Montgomery facility. (Pl. Depo. at 34). Till reported to Jim Stephenson ("Stephenson"), Service Manager in Montgomery. (Bacon Depo. at 48; Bacon Declaration at ¶¶ 3-4). The plaintiff stated that he had a good working relationship with Till and Stephenson, and that they treated him respectfully, on the whole. (Pl. Depo. at 29-30, 43, 46-47).

In the course of his semi-annual evaluations throughout his employment with the defendant, the plaintiff responded to questions about the workplace, indicating that he felt free to discuss any problems with his supervisor or other members of management. (Pl. Depo. at 192-93, Ex. 5 at Docs. 0354, 0361, 0372, 0378, 0384). The plaintiff understood that the defendant had an "open door" policy under which he could report problems to his supervisors or the defendant's Birmingham office, although he stated that he was afraid to reveal his problems. (Pl. Depo. at 26, 59). During his employment in Montgomery, the plaintiff did not complain about his treatment. (Pl. Depo. at 56-57).

In the summer of 2000, the plaintiff requested a transfer to the Panama City facility. (Pl.

---

defendant, unless otherwise noted.

[4]Bacon's declaration is located in the record at doc. 13, among the evidentiary materials submitted by the defendant.

2

Depo. at 53-54). He told Till, Stephenson and Frank Wright ("Wright"), the defendant's Director of Human Resources, that he wanted to transfer in order to be closer to his mother, who lived in Florida and was ill. (Pl. Depo. at 55-56, 59-60).

The plaintiff transferred to the defendant's Panama City facility on July 24, 2000. (Pl. Depo. at Ex. 4). His immediate supervisor there was Elton Adams ("Adams"), Service Supervisor of the facility, who reported to Iven Kennedy ("Kennedy"), Service Manager in Panama City. (Kennedy Declaration at ¶ 3[5]; Bacon Declaration at ¶¶ 3-4).

In December 2000, the plaintiff's mother-in-law, a New York resident, contacted Southworth-Milton, a New York Caterpillar dealer, about possible job opportunities for the plaintiff. (Moul Affidavit at ¶¶ 2-3).[6] She told Wayne Moul, an employee of Southworth-Milton, that the plaintiff and his family intended to move to New York. (Moul Affidavit at ¶ 3). The following January or February, the plaintiff called Frank D'Ambrosio ("D'Ambrosio") at Southworth-Milton and said he wanted to move back to New York so his wife could be closer to her family. (D'Ambrosio Affidavit at ¶ 3).[7] D'Ambrosio told the plaintiff to come to New York for an interview. (D'Ambrosio Affidavit at ¶ 3). The plaintiff did not consider moving anywhere else other than New York. (Pl. Depo. at 227-28; Dunn-Garrow Depo. at 154-55).[8]

---

[5]Kennedy's declaration is located in the record at doc. 13, among the evidentiary materials submitted by the defendant.

[6]Moul's affidavit is located in the record at doc. 13, among the evidentiary materials submitted by the defendant.

[7]D'Ambrosio's affidavit is located in the record at doc. 13, among the evidentiary materials submitted by the defendant.

[8]Dunn-Garrow's deposition is located in the record at doc. 13, among the evidentiary materials submitted by the defendant.

3

In February 2001, the plaintiff put his Panama City-area house up for sale on the real-estate market, but had difficulty selling it.[9] (Pl. Depo. at 226, 230-33). He ultimately sold it five months after he moved back to New York. (Dunn-Garrow Depo. at 129; Pl. Depo. at 308).

The plaintiff's first allegations of harassment came in his March 9, 2001 letter to Michael Thompson, president of the defendant company.[10] (Pl. Depo. at 193, Ex. 6). In it, the plaintiff claimed that he was being harassed because of regional bias. "I was not accepted due to my Northern heritage," he said. "I am still resented due to my being a 'Yankee.'" (Pl. Depo., Ex. 6 at 1). Plaintiff also stated that he had been "ridiculed, harassed and outright threatened almost daily." (Pl. Depo., Ex. 6 at 1). According to the plaintiff, this harassment included verbal abuse and physical threats. He states that he was called names such as "Yankee," "nigger sympathizer" and "queer Yankee nigger lover." (Pl. Depo. at 130-31, Ex. 6 at 1). He also states that Adams, because of his bias against northerners, orchestrated accidents to make the plaintiff appear to be a poor worker. (Pl. Depo., Ex. 6 at 2-3). The plaintiff alleges that this harassment forced him to transfer from Montgomery, but that the harassment continued in Panama City. (Pl. Depo., Ex. 6 at 1).[11]

---

[9]The plaintiff contradicts his deposition testimony by testifying in his subsequent affidavit that he did not put his home on the market until March 2001, after he had complained to the defendant. (Doc. 19 at ¶ 5).

[10]The plaintiff does not recall precisely when he sent the letter and admits he may not have done so until several days after March 9, 2001. (Pl. Depo. at 195).

[11]In this action, the plaintiff phrases his allegations as follows:

during the whole of his employment with Thompson Tractor, he was regularly harassed, threatened, ridiculed, taunted and eased by his co-workers (*Complaint*

4

Upon receiving the plaintiff's letter, Bacon called Kennedy and Stephenson to discuss the allegations therein. (Bacon Depo. at 28-30, 32-34, 51-57, Pl. Ex. 1 at Doc. 430). Bacon asked Kennedy to meet with the plaintiff and to try to resolve the matter. (Bacon Depo. at 63-67). The next day, Kennedy and Adams met with the plaintiff. (Pl. Depo. at 221-23; Wright Depo., Ex. 5 at Docs. 298-301). Kennedy told the plaintiff that he would meet with the shop employees to demand that they stop all forms of horseplay or teasing and to remind them that company rules prohibit harassment. (Bacon Depo. at 68-72, 78; Kennedy Declaration at ¶ 7). Plaintiff asked that the meeting be delayed because he was planning to take some time off. (Pl. Depo. at 113-14; Kennedy Declaration at ¶ 7). Kennedy met with shop employees on March 26. (Wright Depo. at 52; Kennedy Declaration. at ¶ 9).

Near the time of his meeting with Kennedy and Adams, the plaintiff wrote a second

---

¶¶ 11-32). Employees at the Montgomery facility began the harassment. A co-worker named John Ryser stated "[w]hat in the hell is this place coming to, hiring you nigger loving Yankees" and "[i]t's all your fault we can't own niggers" (*Complaint ¶ 11*). Mike Patrick commented that he wanted Plaintiff dead or crushed by a machine, and stated that "[h]e never wanted to be surrounded by nigger loving Yankees" (*Complaint ¶ 11*). Plaintiff was asked if he had engaged in sexual relations with "nigger pussy up in New York" by Robbie Parker. (*Complaint ¶ 15*). After transferring to Panama City, Scott Harris, Ted Shores and Jason Windham called Plaintiff a "nigger lover", "nigger sympathizer", and "nigger loving queer Yankee bastard" (*Complaint ¶¶ 25, 29*). Windham also commented that "the only thing that comes out of New York are nigger lovers and Pollocks", extending his insults to the Polish nationality (*Complaint ¶ 29*). And Mike Byrd, who inquired if Plaintiff watched the "nigger lovin' Yankee channel" on "Net Nigger Entertainment TV', commented that it "ain't shit to kill a Yankee, killing a Yankee is like killing a nigger!" (*Complaint ¶ 27-28*). In addition to verbal harassment, Plaintiff was threatened with weapons, had a snake thrown into his work space, and was splashed with hot oil. (*See Complaint ¶¶ 12, 16, 26, 30; D. Garrow Deposition Exhibits 6 and 7*).

(Doc. 20 at 2-3).

letter to Michael Thompson, which is dated March 19, 2001, although the plaintiff does not recall when it was sent or received. (Pl. Depo. at 212-13, Ex. 7). In it, the plaintiff includes the complaints included in the first letter, and adds descriptions of events allegedly occurring after the plaintiff wrote the first letter. (Pl. Depo. at 210-12). The plaintiff describes an occasion that allegedly occurred on March 17, in which hot oil was intentionally, he believes, spilled on him while he was working on an engine. (Pl. Depo. at 170-77, Ex. 7 at 3-4).

The day Wright received the plaintiff's second letter, he called the plaintiff to schedule a meeting. (Wright Depo. at 60-62, 67-68; Wright Decl. at ¶ 4). Wright then traveled to Panama City and met with the plaintiff for several hours. (Wright Depo. at 64-68, 71, Ex. 6 at Docs. 0302-0306; Pl. Depo. at 245-46). One thing the plaintiff asked during the meeting was that the defendant buy his house and help him move back to New York. (Wright Depo. at 132-33, 141-43; Pl. Depo. at 255). The plaintiff's wife had previously called Mr. Thompson's office to make the same request. (Dunn-Garrow Depo. at 103-06).

In the latter part of March 2001, the plaintiff interviewed for a job at Southworth-Milton in New York. (D'Ambrosio Affidavit at ¶ 4; Pl. Depo. at 113-14). The plaintiff was offered a job and decided to accept it before he returned home, on or about March 23, 2001. (Pl. Depo. at 255-56).

On April 3, Wright returned to Panama City to interview the plaintiff's co-workers, including people the plaintiff claimed would support his allegations. (Wright Depo. at 71-81). During that visit, Wright found a letter dated April 2, 2001, left anonymously for him but signed by the plaintiff and addressed to the U.S. Equal Employment Opportunity Commission, which letter described the plaintiff's claims that he had been harassed. (Pl. Depo. at 257-59, Ex. 13;

6

Wright Depo. at 147). Wright told the plaintiff that he had the right to file the letter, and that the company would continue its investigation. (Wright Depo. at 147-49, Ex. 6 at Doc. 0320).

The defendant's Assistant Director of Human Resources, Kevin Hennigan, also went to Panama City to conduct additional interviews about the plaintiff's complaints. (Wright Depo. at 112, 119-20, Ex. 6 at Docs. 0321-0352). At about the same time, Bacon interviewed employees in the Montgomery facility and investigated the plaintiff's allegations. (Bacon Depo. at 90-91, Ex. 1 at Docs. 0432-0439).[12]

After investigating the plaintiff's claims, the defendant found that shop employees in both Montgomery and Panama City had engaged in puerile behavior, but it did not find that the plaintiff's co-employees had called him by racially derogatory names or had singled him out for harassment or threats of physical harm or that his family had been harassed. (Wright Depo. at 154-55, 163, 175-76; Wright Decl. at ¶ 5; Bacon Depo. at 56-57, 135-38; Bacon Declaration at ¶ 5).

In the course of their investigation, Wright, Bacon and Hennigan each learned that the shop employees teased one another, engaged in practical jokes and called each other names. (Wright Depo. at 86, 89-91, 115-16, Ex. 6 at Docs. 0307-0318; Bacon Depo. at 53-55, 127-29). The investigation disclosed that the plaintiff was sometimes called "Yankee," but that the plaintiff participated in and, at times, instigated horseplay by calling his co-workers "Rednecks" and engaging in practical jokes. (Wright Depo. at 89-91, 102-04, 115-16, 154-55, 171-76; Bacon Depo. at 54-55, 105-06, 112, 127-29, 155).

---

[12]Wright's and Hennigan's notes from the investigation can be found in the record. *See* Wright Depo. at Pl. Ex. 6, Bacon Depo. at Pl. Ex. 1).

In an April 6, 2001, meeting with the plaintiff, Wright and Bacon described their investigation and conclusions they had reached. (Wright Depo. at 154-55; Bacon Depo. at 153-56). The plaintiff criticized the investigation, and repeated his request that the defendant buy his house. (Wright Depo. at 155-56; Bacon Depo. at 162, 167; Pl. Depo. at 255). This request was refused. (Bacon Depo. at 162; Wright Depo. at 156-57).

Wright and Bacon claim that the plaintiff grew increasingly confrontational during the meeting, and that he raised his voice and made threatening movements and gestures. (Bacon Depo. at 166, 169-74; Wright Depo. at 156-57, 184-85). Bacon then offered the plaintiff the choice of resigning or being fired. (Bacon Depo. at 176-77, 179-80; Wright Depo. at 185). When the plaintiff refused to resign, he was terminated effective April 6, 2001. (Kennedy Declaration at ¶ 11).

The plaintiff filed a charge of discrimination with the EEOC on June 29, 2001. (Pl. Depo. at 266, Ex. 12). On August 20, 2001, the EEOC sent the plaintiff correspondence saying that it had stopped investigating his allegations because the claim that he had been discriminated against on the basis of being from the "North" did not constitute a violation of Title VII. (Pl. Depo. at Ex. 15). Plaintiff then filed this action on November 27, 2001, asserting hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Florida Civil Rights Act, Fla. Stat. Ann. § 760.01 *et seq.* ("FCRA").

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### A.     Hostile Work Environment Claim Under Title VII

To establish a prima facie case of hostile work environment racial harassment under Title VII, the plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment "was sufficiently severe or pervasive to alter the terms and conditions of

9

employment and create a discriminatorily abusive working environment"; and (5) a basis for holding the employer liable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (applying the analysis in a sexual harassment context), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000).

The defendant argues that the plaintiff's hostile work environment claim is due to fail because it is based upon allegations that he suffered discrimination based upon his regional origin within the United States. Such a claim would indeed fail because Title VII prohibits employment discrimination only if it is based on "race, color, religion, sex or national origin." 42 U.S.C. §§ 2000e *et seq.* The plaintiff could not establish a prima facie case for regional bias under Title VII, as he could not show that he belongs to a protected group.

The plaintiff, however, argues that his claim is really not about regional bias, but about the discrimination he suffered as a result of his co-employees' beliefs that his regional origin is associated with positive attitudes toward a particular racial group. He states as follows:

> The gravamen of the Plaintiff's claim against Thompson Tractor is a bit more sophisticated than the arguments presented by the defendant would suggest. His claim is not premised on the claim that he was ridiculed and teased because he was a Yankee from "the north". Plaintiff would not disagree that if a resident of the State of Vermont ventured into the State of New York to work, that employee could be harassed and ridiculed because of his State of origin without running afoul of Title VII. Rather, what Plaintiff alleges and the facts demonstrate, his co-workers at Thompson Tractor ridiculed [sic] because he was a "Yankee", which in their minds placed him in a class which they associated with the African American population. Plaintiff was thus the object of derision because he was a "nigger lover" or a "nigger sympathizer", regardless of whether there was any real association between the Plaintiff and that racial group. In the mind of his abusers, Plaintiff was associated with the African American population based solely upon his abusers' perception of an association arising from his having been born and raised in the north, a region they associated with support for the African American race.

(Doc. 20 at 11).

The plaintiff argues that an employee's own race need not be the focus of the racial animus for a hostile work environment to violate Title VII. He argues that racial association can also serve as a basis for Title VII relief. (Doc. 20 at 13, citing *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888 (11th Cir. 1986); *Tetro v. Elliott Popham Pontiac, Olds*, 173 F.3d 988 (6th Cir. 1999); *Chacon v. Ochs*, 780 F. Supp. 680 (C.D. Ca. 1991); *Whitney v. Greater NY Corp. of Seventh-Day Adventists*, 401 F. Supp. 1362 (S.D.N.Y. 1975)). He argues that the abusive comments made by his co-employees are sufficient evidence that the hostile work environment was based upon his racial associations because they equated his regional origin with a positive attitude toward African Americans. (Doc. 20 at 14-15).

A person's association with a particular race can indeed serve as the basis of a Title VII race discrimination claim, but there must be actual association by the plaintiff with an individual of another race. *See, e.g., Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) (interracial marriage); *Chacon v. Ochs*, 780 F. Supp. 680, 682 (C.D. Ca. 1991) (interracial marriage); *Moffett v. Gene B. Glick Co.*, 621 F. Supp. 244, 267 (N.D. Ind. 1985) (plaintiff dated person of another race), *overruled on other grounds by Reeder-Baker v. Lincoln Nat'l Corp.*, 644 F. Supp. 983 (N.D. Ind. 1986); *Gresham v. Waffle House, Inc.*, 586 F. Supp. 1442, 1444-45 (N.D. Ga. 1984) (interracial marriage); *Clark v. Louisa County School Board*, 472 F. Supp. 321 (E.D. Va. 1979) (interracial marriage). *See also Robinett v. First Nat'l Bank of Wichita*, 1989 WL 21158, *1-2 (D. Kan. Feb. 1, 1989) (close friendship of white plaintiff with black co-worker insufficient to establish the type of relationship necessary to support cause of action).

11

In this case, the plaintiff concedes that he never actually "associated" with those of a different race. (Pl. Depo. at 102-03). In fact, he even used racial epithets to refer to them, on occasion, claiming peer pressure from his co-workers. (Pl. Depo. at 137-38).

The plaintiff is essentially asking the court to extend Title VII to encompass a variety of discrimination it has heretofore never addressed–the "perceived association" of one person with those of another race. The plaintiff has not cited any authority directly supporting such an extension of existing law and the court is unwilling to make that leap without such support. The court thus finds that the plaintiff is not a member of a protected group and that he therefore cannot establish a prima facie hostile work environment claim under Title VII. The defendant's motion for summary judgment is due to be granted with respect to the plaintiff's hostile work environment claim under Title VII.

**B.     Retaliation Claim Under Title VII**

The plaintiff next claims that he was terminated "in retaliation for his pursuit of claims of unlawful discrimination and other protected activities, including but not limited to the filing of a complaint with the Equal Employment Opportunity Commission. (Doc. 1 at ¶ 54). Under Title VII, "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. §§ 2000e-3(a). To establish a prima facie case of retaliation under 42 U.S.C. § 2000e-3(a), a plaintiff must show "that (1) [he] engaged in ... statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) there is a causal [connection] between the two events." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000)

The initial element of plaintiff's prima facie case is "established if [he] can show that he opposed an unlawful employment practice which he reasonably believed occurred." *Bigge v. Albertsons, Inc.*, 894 F.2d 1497 (11th Cir. 1990) (emphasis added).[13]

In discussing the necessary showing to establish a *prima facie* case of retaliation under Title VII, the Eleventh Circuit stated as follows:

> We previously have recognized that a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.
>
> A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment;

---

[13] Title VII defines an employment practice as follows:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. §§ 2000e-2(a).

*Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).

In this case, even if the court assumes that the plaintiff subjectively believed that the defendant was engaged in unlawful employment practices, the facts and evidence presented do not support the conclusion that the plaintiff's belief was objectively reasonable. There is no law supporting the existence of a cause of action under Title VII for discrimination based upon regional origin within the United States. Likewise, the plaintiff has not cited, nor has the court been able to discover, any law supporting the existence of a cause of action under Title VII for discrimination based upon perceived association of a person with those of another race, due to the person's regional origin within the United States.

In *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385 (11th Cir. 1998), *cert. denied*, 525 U.S. 1000, 119 S. Ct. 509, 142 L. Ed. 2d 422 (1998), the plaintiffs claimed that they had been fired in retaliation for protesting the defendant's grooming policy on the ground that it constituted unlawful discrimination. The court found that

> [t]he reasonableness of the plaintiffs' belief in this case is belied by the unanimity with which the courts have declared grooming policies like Blockbuster's non-discriminatory." Every circuit to have considered the issue has reached the same conclusion reached by this Court in the *Willingham* [*v. Macon Telegraph Publishing Co.*, 507 F.2d 1084 (5th Cir. 1984)] decision. *See Longo v. Carlisle DeCoppet & Co.*, 537 F.2d 685, 685 (2d Cir. 1976); *Earwood v. Continental Southeastern Lines, Inc.*, 539 F.2d 1349, 1351 (4th Cir. 1976); *Barker v. Taft Broadcasting Co.*, 549 F.2d 400, 401 (6th Cir. 1977); *Knott v. Missouri Pac. R.R. Co.*, 527 F.2d 1249, 1252 (8th Cir. 1975); *Baker v. California Land Title Co.*, 507 F.2d 895, 898 (9th Cir. 1974); *Dodge v. Giant Food, Inc.*, 488 F.2d 1333, 1336 (D.C. Cir. 1973). [Footnote omitted]. The EEOC initially took a contrary position, but in the face of the unanimous position of the courts of appeal that have addressed the issue, it finally "concluded that successful litigation of male hair length cases would be virtually impossible." EEOC Compliance Manual, § 619.1 (Bureau of Nat'l Affairs, Inc.,1996). Accordingly, the EEOC ran up a white flag on the issue, advising its field offices to administratively close all sex discrimination charges dealing with male hair

length. *See id.*

*Harper*, 139 F.3d at 1388.

Although the *Harper* plaintiffs argued that they should not be charged with the substantive knowledge of the case law that rendered their case meritless, the court rejected this contention "because it would eviscerate the objective component of our reasonableness inquiry. *See Little*, 103 F.3d at 960. If the plaintiffs are free to disclaim knowledge of the substantive law," the court stated, "the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge." *Harper*, 139 F.3d at 1388, n.2. *See also Swanson v. Civil Air Patrol*, 37 F. Supp. 2d 1312, 1328-29 (M.D. Ala. 1998) ("the objective reasonableness of an employee's belief that his employer has engaged in an unlawful employment practice must be measured against existing substantive law") (citing *Harper*, 139 F.3d at 1388, n.2).

The substantive law applicable to the plaintiff's claim of unlawful discrimination in this case offers that claim virtually no support. Even assuming that the plaintiff subjectively believes that the defendant was engaged in unlawful employment practices, that belief is not objectively reasonable, given the dearth of case law that could support such a claim. The plaintiff thus cannot meet a required element of his retaliation claim, and the claim thus fails. The defendant's motion for summary judgment is therefore due to be granted as to this claim.

**C.    Claims Under the FCRA**

Citing the same allegations he cites in support of his Title VII claims, the plaintiff also claims that the defendant violated the FCRA by engaging in unlawful discriminatory practices. (Doc. 1 at ¶¶ 57-59). The plaintiff's FCRA claims must fail because his Title VII claims fail. The *Harper* court stated as follows:

> The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII. *See Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So. 2d 1005, 1009 (Fla. 1989); *Florida State Univ. v. Sondel*, 685 So. 2d 923, 925 n.1 (Fla. Dist. Ct. App. 1996); *Gray v. Russell Corp.*, 681 So. 2d 310, 312 (Fla. Dist. Ct. App. 1996); *see also Paris v. City of Coral Gables*, 951 F. Supp. 1584, 1585 (S.D. Fla. 1995); *Kelly v. K.D. Construction of Fla., Inc.*, 866 F. Supp. 1406, 1411 (S.D. Fla. 1994). No Florida court has interpreted the Florida statute to impose substantive liability where Title VII does not. [Footnote omitted]. Therefore, for the same reasons the complaint fails to state a sex discrimination claim under Title VII, it fails to state a sex discrimination claim under the Florida Civil Rights Act.

*Harper*, 139 F.3d at 1387 (11th Cir. 1998).

In this case, the plaintiff's claims under the FCRA fail because his claims under Title VII fail. The defendant's motion for summary judgment is therefore due to be granted with respect to the plaintiff's FCRA claims.

## CONCLUSION

For the reasons set forth above, the court finds that the defendant's Motion for Summary Judgment (doc. 11) is due to be granted.

**DONE** this ___ day of July, 2003.

*[signature]*
JOHN E. OTT
United States Magistrate Judge